# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JOHN J. BAUTISTA,**

      **Plaintiff,**

      **v.**                                       **Case No. 12-CV-126**

**VILLAGE OF LOMIRA and**
**JON SCHULTEIS,** *in his individual capacity*,

      **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

John J. Bautista ("Bautista"), brings this action pursuant to 42 U.S.C. § 1983 against the Village of Lomira ("the Village") and Police Officer Jon Schulteis ("Schulteis") in his individual capacity. The case stems from a May 8, 2011 incident that occurred when Schulteis was dispatched to Bautista's home. Bautista alleges that his Fourth Amendment right to free from unreasonable searches and seizures was violated by warrantless entry into his home and by an arrest not supported by probable cause; that Schulteis used excessive force in arresting him; that the length of his detention in Schulteis' squad car was unreasonably long; and that the subsequent prosecution against him was malicious.

Before the Court is the defendants' motion for summary judgment. Schulteis argues that the federal law claims must be dismissed under the doctrine of qualified immunity and that the state law claim of malicious prosecution must be dismissed for failure to state a claim. The Village, for its part, argues that it is immune from liability under Wis. Stat. § 893.80. The motion has been fully briefed and is ready for decision. For the reasons that follow, the defendants' motion for summary judgment is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

The Village of Lomira is a political corporation that, at all pertinent times, employed Jon Schulteis, an adult resident of the state of Wisconsin. (Defendant's Proposed Findings of Fact

("DPFOF") at ¶ 2, 3.) The plaintiff, John Bautista, is an adult resident of Wisconsin, and at all times pertinent to this action resided in the Village of Lomira. (DPFOF at ¶ 1.) Bautista is married to Sharon Stuebs (Plaintiff's Proposed Findings of Fact ("PPFOF") at ¶ 4), and they were married on December 10, 2010 (PPFOF at ¶ 5). They have lived at 311 Clover Lane in the Village of Lomira since December 10, 2010. (PPFOF at ¶ 6.)

Sharon Steubs was previously married to Jeffrey Steubs (PPFOF at ¶ 7; DPFOF at ¶ 6); the two were divorced in 2007 after 19 years of marriage (PPFOF at ¶ 8). Jeffrey Steubs and Sharon Steubs have four children together: Zachery, who is now 20; Jacob, who is now 18; R.S., who is now 16; and A.S., who is 14. (PPFOF at ¶ 9.) At the time of the incident at issue in this case, Jeffrey Steubs and Sharon Steubs had joint custody of the children (PPFOF at ¶ 10) and the children lived alternatively at the homes of each parent, going back and forth several times each week (PPFOF at ¶ 11). On the day of the incident at issue in this case, May 8, 2011, the Steubs children were at the Steubs/Bautista residence (PPFOF at ¶ 14), along with Bautista's son, A.B., who was 14 at the time and living with Bautista and Sharon Steubs (PPFOF at ¶ 12).

On May 8, 2011, the Dodge County Sheriff's Office received a call from Jeffrey Steubs. (DPFOF at ¶ 4.) At approximately 7:54 p.m., Lomira Police Officer Jon Schulteis was dispatched to 311 Clover Lane in the Village of Lomira. (PPFOF at ¶ 15.) Prior to Schulteis' arrival, there had been what the plaintiff calls a "little disharmony" (PPFOF at ¶ 16) and what the defendants call a "family argument" (Defendants' Response to PPFOF, Docket # 43 at p. 3-4, ¶ 16). Two of the Steubs children, R.S. and A.S., got in trouble for failing to keep their room clean. (PPFOF at ¶ 16.) The plaintiff characterizes the interaction as a "confrontation" (PPFOF at ¶ 16) and a "scold[ing]" (PPFOF at ¶ 18). The defendants characterize Bautista's behavior as "yelling." (DPFOF at ¶ 27.) As

-3-

a result of their interaction—however characterized—with Bautista, R.S. and A.S. were crying. (PPFOF at ¶ 18; *see* DPFOF at ¶ 29.) Bautista then went to the kitchen; Sharon Steubs remained in R.S.' and A.S.' room. (PPFOF at ¶ 19.) Zachery then entered the kitchen (PPFOF at ¶ 20) and asked Bautista some variation of whether it made him feel good to make the girls cry (PPFOF at ¶ 20; DPFOF at ¶ 29). Per the plaintiff, Zachery swore at him. (PPFOF at ¶ 20; *see also* DPFOF at ¶ 29; Defendants' Response to PPFOF, Docket # 43 at p. 4, ¶ 20.) Bautista told Zachery, "The rules are the rules," (PPFOF at ¶ 21) and also told him that he was free to leave if he did not like the rules (PPFOF at ¶ 22; DPFOF at ¶ 30). Zachery went to his room to get his backpack and then returned to the kitchen. (PPFOF at ¶ 23.) The parties dispute the nature of the contact, but as Zachery left the kitchen he made physical contact with Bautista. (PPFOF at ¶ 23; DPFOF at ¶ 31.) The plaintiff states that Zachery "threw his shoulder into" him (PPFOF at ¶ 23; Plaintiff's Response to DPFOF, Docket # 30 at p. 10, ¶ 31); the defendants claim Zachery only "bumped" into Bautista (DPFOF at ¶ 31; Defendants' Response to PPFOF, Docket # 43 at p. 5, ¶ 23). In response, Bautista then pushed Zachery onto the couch. (PPFOF at ¶ 24; DPFOF at ¶ 32.) Both A.B. and Jake Steubs were in the sunroom when this happened and were able to see the incident. (PPFOF at ¶ 25.)

Zachery then sent a text message to his father, Jeffrey Steubs, and told him what happened. (PPFOF at ¶ 27; DPFOF at ¶ 33.) Jeffrey Steubs then contacted the police. (PPFOF at ¶ 27; DPFOF at ¶ 5.) It was to this call that Schulteis responded. (PPFOF at ¶ 27.) Before Schulteis arrived, Sharon Steubs came into the kitchen/living room area and gathered the family. (PPFOF at ¶ 28.) She reminded them that it was Mother's Day, and she told the children that she was disappointed and wanted everyone to get along. (PPFOF at ¶ 29.) Sharon Steubs was crying at the time. (PPFOF at ¶ 30.)

-4-

When Schulteis arrived at the Steubs/Bautista household, he had already been in contact with Jeffrey Steubs. (DPFOF at ¶ 10.) Sharon Steubs answered the door when Bautista arrived. (PPFOF at ¶ 31; DPFOF at ¶ 11.) Sharon Steubs was able to see out of a window in the front door, and she saw that it was a police officer at the front door. (PPFOF at ¶ 32.) She exited the residence and closed the door behind her. (PPFOF at ¶ 33; DPFOF at ¶ 14.) The plaintiff contends that Sharon Steubs closed the door because she did not want the officer inside the house. (PPFOF at ¶ 33; Dec. of Sharon Steubs, Docket # 34 at ¶ 19.) The defendants contend that Sharon Steubs never informed Schulteis that she did not want him in the house. (DPFOF at ¶ 18; Defendants' Response to PPFOF, Docket # 43 at p. 7, ¶¶ 33, 35.) The parties also dispute what Schulteis told Sharon Steubs when explaining why he was there. The plaintiff contends that Schulteis told Sharon Steubs that he was there to investigate a crime. (PPFOF at ¶¶ 38, 39; Dec. of Sharon Steubs, Docket # 34 at ¶¶ 24, 25.) The defendants contend that Schulteis never told Sharon Steubs he was there to investigate a crime (Defendants' Response to PPFOF, Docket # 43 at p. 8, ¶¶ 38, 39; Second Aff. of Jon Schulteis, Docket # 42 at ¶ 3) but was there only to check on the welfare of the occupants (DPFOF at ¶ 17). The plaintiff contends that Schulteis never said that he was there for a welfare check or used words similar to that effect. (PPFOF at ¶ 42.)

When Sharon Steubs came to the door, Schulteis could tell that she had been crying. (DPFOF at ¶ 15.) Schulteis told Sharon Steubs that he needed to speak with Zachery. (PPFOF at ¶ 43.) The parties disagree about what happened next. According to the plaintiff, Sharon Steubs told Schulteis that he could speak to Zachery outside and then opened the door. (PPFOF at ¶ 44.) At this point, according to the plaintiff, Schulteis "barged . . . past her and marched into the house" (PPFOF at ¶ 45) without her consent (PPFOF at ¶¶ 46, 48). The plaintiffs contend that Sharon Steubs explicitly told Schulteis that he was not invited in. (PPFOF at ¶ 47.) The defendants, however, contend that

-5-

Sharon Steubs never indicated to Schulteis that he was not allowed inside the residence. (DPFOF at ¶ 18.) According to the defendants, Schulteis followed Sharon Steubs inside when she reentered the residence. (DPFOF at ¶ 19; Defendants' Response to PPFOF, Docket # 43 at p. 9, ¶ 44.)

Once Schulteis was inside the residence, he saw Bautista standing in the kitchen area. (DPFOF at ¶ 21.) Bautista was behind the kitchen island on the far side of the kitchen. (PPFOF at ¶ 53.) Schulteis did not have a search warrant or an arrest warrant. (PPFOF at ¶¶ 51, 52.) Schulteis encountered Bautista "just after" Schulteis entered the residence. (PPFOF at ¶ 54.) According to the defendants, Bautista immediately began swearing at Schulteis and demanded that Schulteis leave. (DPFOF at ¶ 22.) The plaintiff denies that he swore at Schulteis or raised his voice (Plaintiff's Response to DPFOF, Docket # 30 at p. 7-8, ¶ 22) but does say that he told Schulteis to leave (PPFOF at ¶ 55). According to the defendants, Schulteis told Bautista that he was there on a potential domestic abuse incident and wanted to check on the welfare of the children. (DPFOF at ¶ 23; Defendants' Response to PPFOF, Docket # 43 at p.13, ¶ 56.) According to the plaintiff, Schulteis told Bautista that he was there to investigate a crime and was not going to leave. (PPFOF at ¶ 56.)

According to the defendants, Schulteis then did a quick cursory check of the residence and determined that everyone appeared to be okay. (DPFOF at ¶ 25.) The plaintiff denies that Schulteis ever checked on the occupants or looked in any bedrooms but instead remained in the living room at the edge of the kitchen. (PPFOF at ¶ 58.) Bautista again told Schulteis to leave the residence (PPFOF at ¶ 59). Bautista denies ever swearing or shouting at Schulteis while he was in the residence. (PPFOF at ¶ 61.) Schulteis told Bautista that he would like to speak with him, but Bautista said that he would not speak to Schulteis without an attorney. (PPFOF at ¶ 62.) According to the plaintiff, Schulteis then told Bautista, "Then I'll just go by what [Zachery] says happened." (PPFOF

-6-

at ¶ 63.) Schulteis then asked Zachery to identify himself, which he did. (PPFOF at ¶ 60.) Schulteis then said that he wished to speak with Zachery outside, so Zachery followed Schulteis outside. (PPFOF at ¶ 64.) Sharon Steubs went outside to be with Zachery, but Schulteis told Sharon Steubs to go back into the house. (PPFOF at ¶ 65.) Sharon Steubs advised Zachery that he should not speak to Schulteis without a lawyer, but Schulteis stated that Zachery did not need a lawyer because he was not being interrogated. (PPFOF at ¶ 66.) Sharon Steubs then went back into the house and closed the door. (PPFOF at ¶ 67.) Zachery then relayed what had happened to Schulteis. (*See* DPFOF at ¶¶ 27-33.) Zachery also told Schulteis that he had no injuries and felt no pain as a result of the push. (PPFOF at ¶ 68.) According to the defendants, Zachery also told Schulteis that Bautista had behaved similarly in the past but this was the first time the police were called. (DPFOF at ¶ 28; Defendants' Response to PPFOF, Docket # 43 at p.15 , ¶ 68; *see also* Aff. of Zachery Steubs, Docket # 39 at ¶ 4.) Once Schulteis spoke with Zachery, he was satisfied that there was no threat to anyone's safety. (PPFOF at ¶ 69.) The plaintiff contends, and Schulteis admits, that from that point, he was solely conducting a criminal investigation. (PPFOF at ¶ 70.)

While Schulteis was speaking with Zachery, Bautista left the house by the kitchen door, which leads directly into the garage. (PPFOF at ¶ 72; DPFOF at ¶ 34.) Bautista headed toward a vehicle parked in the driveway (PPFOF at ¶ 73; DPFOF at ¶ 34) to pull it into the garage for the night (PPFOF at ¶ 73). According to Bautista, Schulteis had not indicated that he was not free to leave or that he was under arrest or investigation. (PPFOF at ¶ 71.) The defendants contend, and the plaintiff disputes, that once Bautista was walking towards the vehicle, Schulteis told him to stay where he was and that he was not free to leave. (DPFOF at ¶ 35; Defendants' Response to PPFOF, Docket # 43 at p.16, ¶ 73.)

-7-

The parties dispute what happened next. According to the defendants, Bautista then swore at Schulteis (DPFOF at ¶ 36), got into the vehicle (DPFOF at ¶ 38), and drove it into the garage (DPFOF at ¶ 39). According to Schulteis, Bautista raised his middle finger, swore at him, and came at him in an aggressive manner (DPFOF at ¶ 40). Schulteis had, at this point, called for backup "[a]s a result of Bautista's belligerence." (DPFOF at ¶ 37.) According to Schulteis, he decided to arrest Bautista for disorderly behavior (DPFOF at ¶ 41) and the parties agree that Schulteis then entered the garage to arrest Bautista (DPFOF at ¶ 42). According to Schulteis, Bautista threw a punch at his face (DPFOF at ¶ 43), and a physical altercation ensued that lasted several minutes (DPFOF at ¶ 44). When the altercation ended, Schulteis handcuffed Bautista and directed him to the squad car. (DPFOF at ¶ 45.) When Schulteis attempted to perform a pat down search on Bautista, Bautista refused to cooperate by failing to spread his legs when asked. (DPFOF at ¶ 46.) Another officer, Village of Theresa police officer Aaron Olson, arrived on the scene (DPFOF at ¶ 47) and Bautista was placed in the back of the squad car (DPFOF at ¶ 48).

After Bautista moved his car into the garage, he contends, and the defendants agree, that Schulteis rushed up and began shouting at him (PPFOF at ¶ 74), at which point Sharon Steubs went to the kitchen/garage because she heard loud voices (PPFOF at ¶ 75). Sharon Steubs observed Bautista getting out of the car in the garage and Schulteis running into the garage, yelling at Bautista. (PPFOF at ¶ 76.) However, the defendants do not agree with Bautista's presentation of what happened thereafter. According to Bautista, Schulteis began shouting that he was under arrest. (PPFOF at ¶ 77.) Bautista responded by telling Schulteis to leave the garage because he did not have a warrant, and then Bautista turned to walk back into the house. (PPFOF at ¶ 78.) Schulteis then came up behind Bautista and put his arm around Bautista's neck in a headlock motion (PPFOF at ¶ 79), at which point Bautista did swear at Schulteis, telling him, "Get your [expletive] hands off me"

-8-

(PPFOF at ¶ 80). Then, according to Bautista, Schulteis slammed him face first onto the hood of the car, pulled his hands behind his back, and handcuffed him. (PPFOF at ¶ 83.) Schulteis then patted down Bautista without incident. (PPFOF at ¶ 84.) Bautista states that Schulteis' use of force was unnecessary as he offered no resistence except for telling Schulteis to get out of the garage. (PPFOF at ¶¶ 85, 86.)

The parties agree that Schulteis then escorted Bautista to the squad car, patted him down, and put him into the back of squad. (PPFOF at ¶ 88.) Sharon Steubs then asked why Bautista was being arrested. (PPFOF at ¶ 89.) The parties disagree about the reason Schulteis gave Sharon Steubs, whether it was because he pushed Zachery (PPFOF at ¶ 90) or because of disorderly behavior (Defendants' Response to PPFOF, Docket # 43 at p.10 , ¶ 90; Schulteis Deposition, Docket # 24 at p. 52 ll. 4-24). According to the plaintiff, Sharon Steubs asked whether Zachery would be arrested for pushing Bautista. (PPFOF at ¶ 91.) The parties agree that Schulteis informed her that Zachery would receive a citation (PPFOF at ¶ 92), though one was never issued (PPFOF at ¶ 93).

Schulteis returned to the residence to speak with the children. (PPFOF at ¶ 98; DPFOF at ¶ 49.) According to the plaintiff, Sharon Steubs told the officers that she still did not want them in her house (PPFOF at ¶ 99) but was told that she, too, would be arrested if she interfered (PPFOF at ¶ 100). The defendants contend that Sharon Steubs did not deny them consent to enter the house to complete their interviews. (Defendants' Response to PPFOF, Docket # 43 at p. 22 , ¶ 102; Second Aff. of Jon Schulteis, Docket # 42 at ¶ 12.) The parties agree that Schulteis continued his interview with Zachery outside. (PPFOF at ¶ 103.) Sharon Steubs was in her bedroom (*see* PPFOF at ¶ 108), where the plaintiff contends Sharon Steubs was made to stay (PPFOF at ¶ 104). Schulteis questioned the children. (PPFOF at ¶ 106.) According to the plaintiff, this took over an hour. (PPFOF at ¶ 107.) Thus, the plaintiff contends that he was left in the back of the squad car with his hands cuffed behind

-9-

his back for over an hour. (PPFOF at ¶ 94.) The defendants contends that Bautista was in the back of the squad with his hands cuffed for somewhere between 30 minutes and an hour. (Defendants' Response to PPFOF, Docket # 43 at p. 20 , ¶ 94. ) Bautista was then taken to the Dodge County jail, where he was booked and released. (PPFOF at ¶ 109; DPFOF at ¶ 51.)

As a result of the incident, Schulteis wrote a report. (DPFOF at ¶ 52.) The plaintiffs contend that Schulteis' report contained false information (*see* PPFOF at ¶¶ 114-28), such as indications that Bautista was swearing at Schulteis (PPFOF at ¶¶ 114, 116, 118), that he was behaving in an aggressive manner (PPFOF at ¶¶116, 118, 120), and that he would not comply with commands (PPFOF at ¶¶ 120, 122, 124, 126). Criminal charges were issued against Bautista on May 13, 2011 for resisting/obstructing, contrary to Wis. Stat. § 946.41(1). (PPFOF at ¶ 129; DPFOF at ¶ 53.) The plaintiff contends that the criminal complaint is based upon the report Schulteis wrote (PPFOF at ¶ 130), and the probable cause portion is "taken virtually verbatim" from Schulteis' report (PPFOF at ¶ 131). The parties agree that the district attorney's office did not contact Schulteis about the criminal case (DPFOF at ¶ 58) and that Schulteis did not consult with the district attorney's office about whether charges should be issued (DPFOF at ¶ 57).The charges were ultimately dismissed. (DPFOF at ¶ 54; *see also* PPFOF at ¶ 132.) Per the Order of Dismissal, the district attorney moved to dismiss "for the reason that the officer's entrance into Mr. Bautista's home violated his constitutional right to be free from unreasonable searches." (Order of Dismissal, Docket # 32-2.)

The plaintiff contends, and the defendants dispute, that Bautista's mouth hurt for several days (PPFOF at ¶ 112), as did his hands and wrists (PPFOF at ¶ 113). During his deposition, Bautista stated that he sought no medical or psychological treatment as a result of this incident. (Bautista Deposition, Aff. of. M. Granitz, Docket # 34 at 46.) Bautista said that he had recently had dental

-10-

surgery, which was exacerbated by the incident. (*Id.*) Bautista also contends that he was in shock over being arrested (PPFOF at ¶ 110) and distressed by what happened (PPFOF at ¶ 111).

## ANALYSIS

### Federal Claims

Schulteis moves for summary judgment arguing that each of Bautista's federal claims must be dismissed because he is entitled to qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). It protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* When an officer "reasonably believes that his . . . conduct complies with the law," he is shielded from liability. *Id.* at 244.

The defense of qualified immunity is analyzed in two steps: (1) whether, under the plaintiff's version of the facts, a constitutional right was violated; and (2) whether the right was clearly established at the time of the alleged unconstitutional conduct. *Id.* at 232 (internal citations omitted). In order for a right to be clearly established "a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)). "'[T]he very action in question [need not have] previously been held unlawful' for a public official to have reasonable notice of the illegality of some action." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "a factual case is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional." *Dantzler v. City of Milwaukee*, No. 10-C-0675, 2012 WL

-11-

3778958, * 12 (E.D. Wis. Aug. 30, 2012) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000)).

### 1. Unlawful Entry

Bautista contends that his Fourth Amendment right against warrantless searches was violated when Schulteis entered his home and also when Schulteis entered the garage. (Pl. Br. in Opposition to Mtn. for Summary Judgment, Docket # 36 at 6-9, 9-10.) The defendants argue that Schulteis' warrantless entry into the Bautista/Steubs house was justified by both Sharon Steubs' consent and the exigent circumstances exception to the warrant requirement. (Def. Br. in Support of Mtn. for Summary Judgment, Docket # 23 at 12-13.) As to Schulteis' entry into Bautista's garage, the defendants argue that he had probable cause to arrest him, which allowed him to enter. They also argue that Schulteis had been given consent by Sharon Steubs to enter the home, and he therefore had permission to enter the garage.

### 1.1 Entry into Home

#### 1.1.1 Consent

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. U.S. Const. amend. IV. Among places that can be searched by the police, the home is the most sacrosanct, and therefore receives the greatest Fourth Amendment protection. *See Payton v. New York*, 445 U.S. 573, 583-84 (1980). "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* Though warrantless searches are presumptively unreasonable, consent is an exception the Fourth Amendment's warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted

-12-

pursuant to consent."); *see also United States v. Saucedo*, 688 F.3d 863, 865 (7th Cir. 2012). For consent to be valid, however, it may not be coerced. *Bustamonte*, 412 U.S. at 228; *Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all."). Furthermore, consent must be granted by a person who possesses authority—actual or apparent—over the place to be searched. *United States v. King*, 627 F.3d 641, 647-48 (7th Cir. 2010) (internal citation omitted).

In this case, genuine issues of material fact exist on the question of consent. According to the plaintiff, Sharon Steubs never provided consent and in fact told Schulteis on two occasions that she did not want him in her home. Steubs claims that Schulteis "barged" past her into the residence without her consent the first time he entered and threatened her with arrest the second time he came in. On the other hand, Schulteis contends that Sharon Steubs did consent to his entry. The facts surrounding Sharon Steubs' consent or lack thereof are material to a determination of whether Bautista's Fourth Amendment rights were violated.

Although the material facts on the issue of consent to enter the residence are contested, looking at the facts in the light most favorable to the non-moving party, Bautista has asserted a constitutional violation. Additionally, as of May 8, 2011, it was "clearly established" that a warrantless entry into his home would violate his Fourth Amendment rights. There can be no doubt that warrantless searches are presumptively unreasonable. *Payton*, 445 U.S. at 586. Therefore, Schulteis should have reasonably known that without a warrant, he would need consent—or another exception to the warrant requirement—to enter the residence. *See Bustamonte*, 12 U.S. at 219. Accordingly, because material facts remain in dispute as to the alleged constitutional violation, summary judgment based on a defense of qualified immunity is not appropriate.

-13-

### 1.1.2 Exigent Circumstances

Like consent, exigent circumstances provide an exception to the Fourth Amendment warrant requirement. *See Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Michigan v. Tyler*, 436 U.S. 499 (1978)). Where there is a "compelling need for official action and no time to secure a warrant," police may enter a residence without a warrant. *Id.* (internal quotation marks omitted). The police must believe that "their safety, or the safety of the public, may be threatened." *United States v. Webb,* 83 F.3d 913, 916 (7th Cir. 1996). However, the officer or officers must reasonably believe that there was a compelling need and reasonably believe that there was insufficient time to secure a warrant, and a court's inquiry is therefore an objective one. *Fitzgerald*, 707 F.3d at 730 (citing *Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011)). Furthermore, "the reasonable belief must be based on actual knowledge the officers had at the time of the entry, rather than on knowledge acquired after the fact." *Id.* at 730-31 (citing *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)). "The key question in a warrantless entry case is whether 'the circumstances as they appeared *at the moment of entry* would lead a reasonable, experienced law enforcement officer to believe that someone inside the house . . . required immediate assistance.'" *Id.* at 731 (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993)) (emphasis in original).

The defendants argue that exigent circumstances existed sufficient to justify Schulteis' entry into the Bautista/Steubs home, even if Sharon Steubs did not consent. (Def. Br. in Support of Mtn. for Summary Judgment, Docket # 23 at 13.) They state that at the time Schulteis entered the residence, he "was there to investigate a possible domestic abuse crime." (*Id.*) At that time, he "knew . . . that Bautista was involved in a physical altercation with Jeffrey Stuebs' child, Zachery." (*Id.*) The defendants also point out that Sharon Steubs exited the residence quickly and with "watery eyes,"

-14-

as she had been crying. (*Id.*) Schulteis states that he needed to enter the residence to ensure that no one was in danger and/or no one in the residence was in need of medical attention. (*Id.*) These facts, they argue, amount to exigent circumstances.

There is no doubt that Schulteis entered the Steubs/Bautista home; that fact is not in dispute. Thus, the question is whether it was unreasonable for Schulteis to believe that he could enter the residence based on exigent circumstances. If Schulteis reasonably believed that exigent circumstances existed to justify the warrantless entry, he is entitled to qualified immunity. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005) (internal citation omitted). As noted above, Schulteis contends that he was there on a domestic abuse call. He had received instruction to go to the residence after Zachery's father, Jeffrey Steubs, called 911 to report that his son had been pushed into a couch by the plaintiff. (*See* Narrative of Exchange Between Dispatch and Schulteis, Docket # 33-4 at 1.) While a 911 call can help support a warrantless entry under the exigent circumstances exception, *see, e.g.*, *Leaf*, 400 F.3d at 1081-82 (finding exigent circumstances where officers found a broken window and open patio door when responding to a 911 call that a man had forced entry into the residence), the facts do not support such a finding at this juncture. The defendants cite *Anderson v. City of West Bend*, 774 F. Supp. 2d 925 (E.D. Wis. 2011), to support their argument that exigent circumstances existed. However, *Anderson* is distinguishable from the present case. In *Anderson*, the district court found that exigent circumstances existed where there was a 911 call, neighbors reported hearing calls for help and indications of a physical altercation, the alleged victim sounded distraught when she first spoke with the officers, and the alleged victim locked herself into the apartment with the alleged assailant. 744 F. Supp. 2d at 939. Even under Schulteis' version of the facts, it is not clear—as it was in *Anderson*—that exigent circumstances justified Schulteis' entry into the house.

-15-

Thus, construing the facts in Bautista's favor, he has alleged a constitutional violation. Additionally, as noted above, that warrantless searches are presumptively unreasonable is undoubtedly clearly established law. *Payton v. New York*, 445 U.S. 573, 586 (1980). That a police officers needs an exception to the warrant requirement is equally well established. *See, e.g.*, *Katz v. United States*, 389 U.S. 347 (1967). As with the question of consent, disputed facts material to the objective reasonableness of the officer's belief that exigent circumstances existed remains. Thus summary judgment based on a defense of qualified immunity is likewise not proper.

### 1.2    Entry into Garage

Bautista also alleges that Schulteis violated his Fourth Amendment right to be free from unreasonable searches when Schulteis entered the garage to arrest him. (Complaint, Docket # 1 at ¶ 501; Pl. Br. in Opposition to Mtn. for Summary Judgment, Docket # 36 at 9-10.) The defendants argue that Schulteis had probable cause to arrest Bautista, therefore allowing him to enter the garage to effectuate the arrest. (Def. Br. in Support of Mtn. for Summary Judgment, Docket # 23 at 13-14.) The defendants also argue that Sharon Steubs had given consent for Schulteis to enter the home, thereby also giving him consent to enter the garage.

When police have probable cause to arrest but do not have a warrant, exigent circumstances must exist to "justify the . . . warrantless entry . . .[made by the officer] to effectuate the arrest." *United States v. Craig*, No. 93-1761, 1993 WL 498029, *5 (7th Cir. 1993) (unpublished); *see also Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1341 (7th Cir. 1985). Therefore, Schulteis' warrantless entry into the garage had to be justified by exigent circumstances. In the context of warrantless entry to effectuate a warrantless arrest, courts look to several factors, including (1) whether the crime of which the suspect is accused is a "grave or violent offense"; (2) whether the officers have reason to

-16-

believe that the suspect is armed; (3) whether the officers had "probable cause to believe that the suspect committed the crime"; (4) whether there was "strong reason to believe that the suspect" was in the location the officers entered to effectuate the arrest; and (5) whether it was likely that delay would "cause the escape of the suspect or the destruction of essential evidence" or jeopardize the safety of the officers or the public. *Craig*, 1993 WL 498029, *6 (internal citations omitted). In *Welsh v. Wisconsin*, the Supreme Court held that "the gravity of the underlying offense for which the arrest is being made" is an especially important factor when determining whether exigent circumstances existed to enter a suspect's home without a warrant to effectuate an arrest. 466 U.S. 740, 753 (1984).

In the present case, all the material facts surrounding the entry into the garage are disputed. There remains a material factual dispute about whether Schulteis had probable cause to arrest Bautista. As discussed above, it remains disputed whether exigent circumstances existed to enter the residence. And it also remains disputed whether Sharon Steubs consented to the entry into the home.

However, viewing the facts in favor of Bautista, as the Court must, he has asserted a constitutional violation. And as of the date of the incident, it was clearly established that an officer needs both probable cause to arrest and exigent circumstances to enter a residence. *See Payton v. New York*, 445 U.S. 573 (1980); *Moore*, 754 F.2d at1341 (explaining that since *Payton* was decided, "any warrantless entry into a house to effectuate an arrest, absent exigent circumstances, has been considered to be a violation of the Fourth Amendment . . . ."). Thus, with the material disputed facts remaining on the underlying questions on qualified immunity, summary judgment will be denied.

2.    *Excessive Force*

Bautista claims that Schulteis used excessive force when arresting him, violating his Fourth Amendment right to be free from unreasonable seizures. (Compl., Docket # at ¶ 501.) Excessive

-17-

force claims are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The standard applied is one of reasonableness, *id.*, and to "[determine] whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake," *id.* at 396 (quoting *United States v. Place*, 462 U.S. 696 (1983)). This is a an inquiry that "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal citation omitted). Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and courts should include "allowance for the fact that police officers are often forced to make split-second judgments" in situations that are "rapidly evolving." *Id.* at 397.

Here again, although material facts remain in dispute, taking the facts in the light most favorable to the plaintiff, as the Court must, Bautista has alleged a constitutional violation. According to Bautista, Schulteis came running into the garage and, without provocation, put Bautista into a headlock, and then slammed his face into the car. He also alleges that when Schulteis put the handcuffs on him, Schulteis did so such that the cuffs were very tight. Considering the factors highlighted in *Graham*—the severity of the crime, the safety of the officers, and resistance to arrest or evasion by flight—Schulteis had no grounds for arresting Bautista in the manner Bautista says he did. According to Schulteis, Bautista was arrested for disorderly conduct, a Class B misdemeanor. Wis. Stat. § 947.01(1). Looking at the facts in the light most favorable to Bautista, he was not armed

-18-

and therefore posed a minimal threat. Further, according to Bautista, he did not resist arrest, and there is no indication that Bautista intended or planned to evade arrest by flight. And though Bautista does not claim that he suffered serious injury as a result of the alleged force, he does describe pain, which was exacerbated by recent oral surgery. *See Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) (internal citations omitted) ("Although injury is a relevant factor in determining whether an officer used excessive force, an excessive force claim does not require any particular degree of injury.").

Because the material facts surrounding Bautista's arrest remain in dispute, it is difficult to know whether the force used was unreasonable and whether Schulteis should have known that the force he used against Bautista was unreasonable. These are questions for the jury. However, "it was clearly established that 'police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'" *Payne v. Pauley*, 337 F.3d 767, 778, 780 (7th Cir. 2003) (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)) (finding that, according to the plaintiff's account, the officer should have known the force he used was unreasonable when the officer ran at the plaintiff, knocking into her, then forced her arms behind her back, twisted her arm, and over-tightened the handcuffs where plaintiff did not resist arrest and was alleged to have committed a minor, non-violent crime). Per Bautista's account, Schulteis acted without provocation, and thus should have known that the force he used was unreasonable. Furthermore, the right to be free from excessive force as a Fourth Amendment protection has been recognized since 1989. *See Graham v. Connor*, 490 U.S. 386 (1989) (finding that excessive force claims under § 1983 should be analyzed under the Fourth Amendment, rather than substantive due process). Therefore, the Court cannot grant a motion for summary judgment based on a defense of qualified immunity.

-19-

*3.    Unlawful Seizure*

3.1    False Arrest

Bautista also alleges that he was unlawfully seized without probable cause in violation of the Fourth Amendment. (Compl., Docket # 1 at ¶ 503.) In order to prevail on a § 1983 false arrest claim, the plaintiff "must show that probable cause for his arrest was lacking." *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (citing *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause.")) Thus, probable cause for the arrest is "an absolute defense to any claim under Section 1983." *Id.* (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). An officer has probable cause to arrest "when, at the moment the decision is made, the facts and circumstances within [his] knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that suspect had committed or was committing an offense." *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 878-79 (7th Cir. 2012) (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)). The Court must consider "the elements of the predicate criminal offense(s) as defined by state law," though probable cause of any crime, even if not the one for which the plaintiff was arrested, will suffice. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 715 (7th Cir. 2013). Furthermore, where "the underlying facts [regarding the arrest] are undisputed, the court can make that decision on summary judgment" though the jury "[u]sually . . . determines whether the arrest was supported by probable cause." *Id.* at 714 (internal citations omitted).

To repeat, this is not a case where the facts underlying the arrest are undisputed. Schulteis argues that he had probable cause to arrest Bautista, particularly for disorderly conduct. However, material facts remain in dispute. The disorderly conduct statute, Wis. Stat. § 947.01(1) states:

-20-

"[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor." Schulteis' recounting of the incident would provide probable cause to arrest for disorderly conduct. According to Schulteis, Bautista began swearing at him from the time he walked into the house. Bautista also raised his middle finger toward him and showed aggressive behavior.

However, Bautista's version of the events would not support a finding of probable cause. Bautista contends that he did not swear at Schulteis until he was being arrested or engage in any behavior that was aggressive. According to Bautista, he communicated with Schulteis only minimally: he told Schulteis to leave his house and told Schulteis that he did not want to speak to him without an attorney. Taking the facts in the light most favorable to the plaintiff, Schulteis did not have probable cause to arrest Bautista for disorderly conduct, and Bautista has therefore alleged a constitutional violation.

Though probable cause to arrest for any crime, even if not the one alleged, is enough to provide an absolute defense to a false arrest claim, *Abbott*, 705 F.3d at 715, the defendant does not allege, and this Court has not found, any other potential basis for probable cause to arrest Bautista. Particularly, Schulteis did not have probable cause to arrest Bautista at the time he first arrived at the Bautista/Steubs residence. The 911 call and Sharon Steubs exiting the residence with tears in her eyes did not provide probable cause to arrest Bautista for anything that happened leading up to Schulteis' arrival. Though 911 calls can provide probable cause to enter, the unsubstantiated report from the 911 call would not lead a reasonable officer to believe that he could arrest Bautista. *See, e.g.,* *Hanson v. Dane County, Wis.*, 608 F.3d 335, 337-38 (7th Cir. 2010) (finding probable cause for

-21-

warrantless entry where 911 call was made, was incomplete, and the callback went unanswered).

As Bautista has alleged a constitutional violation when all facts are construed in his favor, the remaining question is whether the law surrounding the need for probable cause for an arrest is "clearly established." As explained in *Mahoney v. Kesery*, whether Schulteis' "immunity defense can be sustained turns on whether 'a reasonably well-trained officer in his position would have known' that the facts did not establish probable cause for arrest." 770 F. Supp. 472, 476 (E.D. Wis. 1991) (citing *Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988)). Construing the facts in Bautista's favor, Schulteis should have known that Bautista's request that Schulteis leave his home and refusal to answer questions without a lawyer did not amount to probable cause to arrest Bautista for disorderly conduct. It would not even amount to "arguable probable cause." *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714-15 (7th Cir. 2013) ("The probable cause standard inherently allows room for reasonable mistakes, but qualified immunity affords an added layer of protection by shielding officers from 'suit for damages if a "reasonable officer could have believed [the arrest] to be lawful . . . .'" (internal citations and quotations omitted)). Therefore, Bautista's false arrest claim also survives summary judgment.

3.2     Period of Time in Vehicle

In the present case, Bautista challenges the length of time he spent handcuffed in the back of Schulteis' squad car following his arrest. The Seventh Circuit has explained that "[a]n excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). In *Chortek*, the defendants challenged the length of time it took for them to be processed at the police station following their arrests for violating a city ordinance prohibiting ticket

-22-

scalping. *Id.* at 743. For some of the defendants, it took more than four hours to be processed and released from the station. *Id.* at 747-48. Therefore, the detention challenged in *Chortek* is analogous to the detention Bautista challenges in the present case. *See id.* at 746. ("Here, neither extended detention of the plaintiffs nor probable cause hearings were contemplated. Rather, the police held the plaintiffs only while they contemplated their processing.")

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Here, too, the question of whether the length of Bautista's detention was constitutionally permissible turns on reasonableness. In *Gerstein v. Pugh*, the Supreme Court held that "[a] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest." 420 U.S. 103, 113-14 (1975).

Bautista has not alleged facts that make his detention unreasonable as a matter of law. That is, even if the facts Bautista alleges are true—that he was handcuffed in the back of Schulteis' squad car for over an hour—Bautista's detention is not necessarily unreasonable. Moreover, the Seventh Circuit has stated "that the reasonableness of a length of detention typically 'is a question best left open for juries to answer based the facts presented in each case." *Chortek*, 356 F.3d at 747 (citing *Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir. 1998)).

However, whether Bautista's detention in the squad car was reasonable also depends on whether there was, in fact, probable cause to arrest him. As explained above, the question of probable cause is a question of fact that is best left to the jury. There are material facts still in dispute regarding the existence or nonexistence of probable cause for Bautista's arrest. That is, a reasonable jury could find that there was not probable cause for Bautista's arrest.

-23-

In sum, because the reasonableness of the length of Bautista's detention in the squad car is closely related to other disputed facts, such as probable cause to arrest, disposition on summary judgment is not appropriate.

**State Law Claim**

*1.        Malicious Prosecution*

In order to state a claim for malicious prosecution, Bautista must prove six elements: "1. There must have a prior institution or continuation of some regular judicial proceedings against the plaintiff in this action for malicious prosecution; 2. Such former proceedings must have been by, or at the instance of the defendant in this action for malicious prosecution; 3. The former proceedings must have terminated in favor of the . . . plaintiff in the action for malicious prosecution; 4. There must have been malice in instituting the former proceedings; 5. There must have been want of probable cause for the institution of the former proceedings; 6. There must have been injury or damage resulting to the plaintiff from the former proceedings." *Elmer v. Chicago & N.W. Ry. Co.*, 257 Wis. 228, 231, 43 N.W.2d 244, 246 (Wis. 1950).

The defendants argue that the plaintiff cannot establish several of these elements: first, they argue that Bautista cannot show that Schulteis initiated the criminal case against Bautista; second, the defendants argue that Bautista cannot show that Schulteis acted with malice; and third, they argue that Bautista cannot offer evidence of injury or damage as a result of the criminal case.

Bautista has alleged no facts that would allow this Court to infer that criminal proceedings against Bautista were initiated by Schulteis or at Schulteis' insistence. The defendants' argument—that Bautista cannot satisfy the second element because the assistant district attorney was the one to actually file charges—fails to recognize that Schulteis could incur liability by insisting that the charges be brought. Nonetheless, Bautista has alleged no facts to this effect. Rather, Bautista

-24-

argues that because Schulteis wrote the police report that served as the basis of a criminal complaint, Schulteis initiated the proceedings against him. This argument is attenuated; prosecutors have discretion in what cases they will charge and are the officials ultimately responsible for the issuance of a criminal complaint. *See, e.g.*, *State v. Lindsey*, 203 Wis. 2d 423, 440, 554 N.W.2d 215, 221 (Ct. App. 1996) ("Wisconsin case law has repeatedly held that the discretion whether to charge and how to charge vests solely with the district attorney."). Additionally, the element requires that the prosecution was initiated at Schulteis' insistence, which suggests more is required than writing a report and submitting it to the district attorney's office for review. In fact, in responding to the Defendant's Proposed Findings of Fact, Bautista did not dispute that Schulteis was not contacted by the district attorney's office and did not consult with the district attorney's office about whether charges should be issued against Bautista. (Plaintiff's Response to DPFOF, Docket # 30 at p.17 , ¶ 57.)

Therefore, because Bautista has failed to put forth any evidence that would allow this Court to infer that Schulteis was responsible for the initiation of proceedings against him, the defendant's motion for summary judgment is granted as to Bautista's state law claim of malicious prosecution.

### 2. Discretionary Immunity under Wisconsin State Law

The defendants also argue that Schulteis is entitled to discretionary immunity under Wis. Stat. § 893.80 for state law claims. Under the statute, discretionary acts of governmental agents or employees "are protected by the statute," though "ministerial duties are not." *Showers Appraisals, LLC v. Musson Bros., Inc.*, 2012 WI App 80, ¶ 9, 343 Wis. 2d 623, 632, 819 N.W.2d 316, 320 (internal citation omitted). For purposes of the statute, "[a] discretionary act is one that involves an exercise of judgment when applying rules to the facts." *DeFever v. City of Waukesha*, 2007 WI App 266, ¶ 7,

-25-

306 Wis. 2d 766, 773, 743 N.W.2d 848, 851 (internal citation omitted). Ministerial acts are those that involve "an act that is an absolute and certain duty imposed by law, which prescribed the manner in which it is to be performed . . . . [and] does not require the use of judgment or discretion." *Id.* at ¶ 8, 306 Wis. 2d at 773, 743 N.W.2d at 851. In addition, immunity does not apply when the state or municipal officer or employee acted in a way that was "malicious, willful, and intentional." 2008 WI App 167, ¶ 16, 314 Wis. 2d 706, 717, 760 N.W.2d 164, 179 (internal citation omitted).

Because the Court has granted summary judgment on the only state law claim—malicious prosecution—the Court need not decide whether discretionary immunity applies. However, Schulteis suggests that discretionary immunity should apply to the other claims Bautista has brought under § 1983. Particularly, Schulteis argues that cases from both the Wisconsin state courts and federal courts "have held that Wisconsin's 'discretionary immunity' applies to the decisions of police officers related to whether and how to arrest." (Def. Br. in Support of Mtn. for Summary Judgment, Docket # 23 at 15.) The cases that Schulteis cites to, however, do not support the application of discretionary, or statutory, immunity to Bautista's federal causes of action. In *Wilson v. City of Milwaukee*, the district court found that decisions "concerning whether and how to arrest . . . are discretionary for purposes of Section 893.80(4)." 138 F. Supp. 2d 1126, 1130 (E.D. Wis. 2001). The court then granted partial summary judgment; specifically, the court granted summary judgment as to the plaintiff's state law negligence claim. *Id.* at 1133. The plaintiff's excessive force claim under § 1983 remained. *See id.* at 1128.

Similarly, in *Sheridan v. City of Janesville*, the Wisconsin Court of Appeals held that discretionary immunity applied to the plaintiff's negligence action against two police officers and the city of Janesville. 164 Wis. 2d 420, 428 N.W.2d 799, 803 (Ct. App. 1991). Again, this case deals with

-26-

a state law claim rather than a federal claim under § 1983. Schulteis' citation to *Johnson v. City of Milwaukee* also demonstrates that discretionary immunity is available only on state law claims. 41 F. Supp. 2d 917 (E.D. Wis. 1999). In *Johnson*, the plaintiff brought several federal claims under § 1983 as well as a state law claim of negligence. *Id.* at 923. The district court found that discretionary immunity under Wis. Stat. § 893.80(4) applied as to the plaintiff's state law negligence claim. *Id.* at 932. The court did not apply discretionary immunity to the plaintiff's federal claims, however. *See id.* at 923-31.

Therefore, this Court will not, and should not, apply discretionary immunity pursuant to Wis. Stat. § 893.80(4) to Bautista's claims under § 1983.

**The Village of Lomira's Liability**

*1.      Immunity/Indemnification*

The Village of Lomira argues that it is immune from any claims arising out of the intentional acts of its officials, agents, of employees under Wis. Stat. § 893.08(4). In his response brief, however, Bautista states that he is "not asserting any direct liability claims against the Village," but is instead only seeking "indemnification pursuant to the requirement that a municipality satisfy any judgment entered against its employee" pursuant to Wis. Stat. § 895.46. Therefore, the plaintiff does not seek to hold the Village liable for Schulteis' actions. This is further evidenced by Bautista's statement that he "does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of the Village of Lomira." In order to establish municipal liability under § 1983, Bautista would have to "show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of*

-27-

*Chicago*, 690 F.3d 829, 833-34 (7th Cir. 2012) (internal citations omitted); *see also Monnell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

Wis. Stat. § 895.46(1)(a) provides that "[i]f the defendant in any action . . . is a public officer or employee and is proceeded against in an official capacity or . . . as an individual because of acts committed while carrying out duties as an officer or employee," damages shall be paid by the state or political subdivision of which the defendant is an employee if the court or jury finds the defendant was acting within the scope of his employment. The state or political subdivision also must pay reasonable attorney fees and costs if it does not provide an attorney to the defendant, so long as it is determined that the defendant was acting within the scope of his employment. Wis. Stat. § 895.46(1)(a). This statute is applicable to police officers—so long as they acted within the scope of their employment. *Cf. Graham v. Sauk Prarier Police Com'n*, 915 F.2d 1085, 1091-92 (7th Cir. 1990) (determining whether the defendant officer was entitled to indemnification under Wis. Stat. § 895.46); *Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 307 N.W.2d 164 (Wis. 1981) (deciding whether the City of Milwaukee had to indemnify the defendants, two of whom were police officers, based on whether they were acting within the scope of their employment). Thus, it is not improper for the Village of Lomira to be named as a party for the purposes of indemnification if Schulteis is found to have violated the plaintiff's constitutional rights.

2.    *Punitive Damages*

The Village of Lomira also argues that it is immune from any punitive damages that may be awarded to the plaintiff under Wis. Stat. § 893.80(3). It is true that § 893.80(3) states that "[n]o punitive damages may be allowed or recoverable in any such action under this section." It also true that punitive damages are not allowed against a municipality in federal causes of action unless

-28-

expressly authorized by statute. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). However, the Seventh Circuit has interpreted Wis. Stat. § 846.95 as authorizing the payment of punitive damages by a municipality when it is required to indemnify its employee. *Graham*, 915 F.2d 1085, 1088-1093 (discussing the court's reasoning for finding that Wis. Stat. § 895.46 requires municipalities to indemnify even punitive damages). Particularly, the Seventh Circuit explained that in a prior case, it had found that "the Wisconsin indemnity states applied 'to all "judgments," no distinctions being made for compensatory versus punitive damages,'" concluding that "Wisconsin's indemnity statute was a state-created rule shifting liability to municipalities for punitive damage awards against their employees." *Id.* at 1090 (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1270 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)).

Therefore, the Village of Lomira is properly a party to this action for the purposes of satisfying its potential indemnification obligations under Wis. Stat. § 895.46.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket # 22) is **GRANTED IN PART AND DENIED IN PART.**

Dated at Milwaukee, Wisconsin this 31st day of May, 2013.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

-29-